Filed 1/13/22  In re Pablo V. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re PABLO V., a Person Coming Under the Juvenile Court Law. | B312434 (Los Angeles County Super. Ct. No. 19CCJP01918A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MONICA M.,<br><br>    Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Linda L. Sun, Judge.  Affirmed.

Donna P. Chirco, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Sally Son, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

The juvenile court terminated the parental rights of Monica M. (mother) over her now-three-year-old son, Pablo V.  On appeal, mother challenges the juvenile court's (1) denial of her petition to provide reunification services under Welfare and Institutions Code section 388[1] and (2) finding that the parent-child bond exception to the termination of parental rights did not apply.  Both rulings were within the court's discretion or supported by substantive evidence, so we affirm.

**FACTS AND PROCEDURAL BACKGROUND**

**I.    Facts**

Prior to 2018, mother had five children with several men— Cesar (born 2002), Rudy (born 2006), Gabriela (born 2008), Valerie (born 2012), and Winter (born 2016).

In a variety of juvenile dependency cases, the juvenile court exerted dependency jurisdiction over these children; ultimately, the court terminated mother's parental rights over Rudy, Valerie and Winter, and awarded sole custody of Cesar and Gabriela to their fathers.

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

Mother and Pablo V. (father) started dating in 2018. Their relationship was tumultuous. They had verbal arguments that sometimes turned physical: Father punched mother in the face when she was three months pregnant with their child, "dropped her" onto the floor about two times, and pulled her hair; on one occasion, mother bit father on the cheek. Pablo was born in September 2018, and some of these altercations occurred in Pablo's presence. Mother was diagnosed with depression in 2014 and prescribed Prozac, but has never taken medication. Mother is also a long-time user of methamphetamine, marijuana and alcohol, having started as a teenager; she had major relapses in 2014 and 2017. She admitted to ingesting methamphetamine as recently as December 2018.

In February 2019, mother was reported to be homeless and to be leaving Pablo in her car "for days at a time." Several people who interacted with mother at that time suspected, based on her behavior, that she was again using methamphetamine.

## II. Procedural Background

### A. *Petition, Jurisdiction & Disposition*

On March 25, 2019, the Los Angeles Department of Children and Family Services (the Department) filed a petition asking the juvenile court to exert dependency jurisdiction over Pablo due to (1) mother's and father's "history of engaging in violent altercations in [Pablo's presence]," which placed Pablo at substantial risk of serious physical harm (thereby warranting the exercise of dependency jurisdiction under subdivisions (a), (b)(1) and (j) of section 300), (2) mother's "history of substance abuse," which renders her "unable to provide regular care and supervision" over Pablo and thus places him at substantial risk of serious physical harm due to his "young age" (thereby warranting

3

the exercise of jurisdiction under subdivisions (b)(1) and (j) of section 300), and (3) mother's "mental and emotional problems," which also render her "incapable of providing regular care and appropriate supervision for [Pablo]," which places him at substantial risk of serious physical harm (thereby warranting the exercise of jurisdiction under subdivision (b)(1) of section 300).[2]

On April 26, 2019, the juvenile court sustained all three allegations involving mother on all grounds alleged.

On May 13, 2019, the court ordered Pablo removed from mother. The court also denied her any reunification services due to the prior juvenile court orders terminating reunification services over Pablo's half-siblings, the prior orders terminating mother's parental rights over some of those half-siblings, and mother's "history of extensive, abusive, and chronic use of drugs or alcohol." (§ 361.5, subds. (b)(10), (b)(11) & (b)(13).)

The court set a hearing regarding the termination of mother's parental rights for September 6, 2019.

B. *Period between disposition and final hearing*

For several reasons, including the COVID-19 pandemic, the hearing on whether to terminate mother's parental rights did not occur until March 18, 2021.

The juvenile court detained Pablo from mother's custody on March 26, 2019, when he was six months old. He was initially placed with maternal grandmother, but moved to the paternal aunt and uncle's custody in January 2020.

During this period, the juvenile court authorized mother to have two monitored visits per week, for two hours each. Between

---

[2] The Department also alleged that jurisdiction was appropriate due to father's "history of substance abuse," but that allegation is irrelevant to this appeal.

March and October 2019, mother did not visit Pablo at all because she was incarcerated through September 2019 and thereafter living at a residential drug treatment program with a "no visitation" policy for the first 30 days. During this period, mother would call maternal grandmother to check in on Pablo every other day. In 2020, mother had seven in-person visits with Pablo, and on occasion, went months without any visits at all, although she would call him during those stretches. Mother had only three in-person visits with Pablo in 2021 prior to the March 2021 hearing. Indeed, mother frankly admits that her visits with Pablo were not "consistent."

During this time, Pablo became "very bonded" with his paternal aunt and uncle, and calls them "mommy and daddy."

### C. *Mother's section 388 petition*

On January 13, 2021, mother filed a petition asking the juvenile court to provide her six months of reunification services and to assess whether to allow unmonitored, overnight visits with Pablo. In the petition, mother asserted that (1) her circumstances had changed because she (a) completed a three-month residential drug treatment program, (b) completed a three-month outpatient drug treatment program, and (c) has been sober for two years, and (2) allowing further reunification services would be in Pablo's best interest because (a) she is his mother and "[i]t would be in [Pablo's] best interest to . . . be raised by his mother," and (b) she has a "close bond" with him because they "enjoy playing together."

After concluding that mother's petition set forth a prima facie showing of entitlement to relief, the juvenile court set the petition for an evidentiary hearing on the same day as the hearing to decide whether to terminate mother's parental rights.

5

At the evidentiary hearing, mother testified that her circumstances had changed because (1) she completed three months of the 18-month inpatient drug treatment program between August and November 2019, (2) she completed a three-month outpatient program between January 2020 and June 2020 (which took six months because she fell ill with COVID-19), (3) she was now "getting back . . . involved" in attending narcotics anonymous meetings online, and (4) she last used drugs two years prior.  Mother testified that affording her reunification services was in Pablo's best interests because (1) she had "monthly" visits in 2020 and had three "weekend visitations" with Pablo in 2021, and (2) she and Pablo had a "mom-and-son relationship" because Pablo calls her "mom" and they "do a lot of things together on [their] time that [they] have," such as reading books, eating, singing and "do[ing] bath time."

The juvenile court denied mother's section 388 petition. The court "applau[ded] mother for taking the initiative to complete the drug program," but concluded that mother's circumstances were "changing" but not changed because two of the three reasons for the juvenile court's intervention—mother's mental health and mother's history of domestic violence—remained unaddressed.  The court also found that it would not be in Pablo's best interest to start up reunification services because Pablo was "bonded with the current caregivers" and had been with them for over a year, such that jeopardizing Pablo's stability in order to accommodate mother—who had only made "inconsistent visits"—was not in his best interests.

D.    *Termination of parental rights*

The juvenile court held the hearing on the termination of mother's parental rights on March 18, 2021.  Mother argued that

6

the parent-child bond exception applied, and thus precluded an order terminating her parental rights. The juvenile court rejected that argument on several grounds—namely, (1) that mother "has not maintained regular visitation with the child," (2) that mother "has not established a bond with the child," and that (3) terminating mother's relationship with Pablo would not be detrimental to Pablo because "any benefit accruing" to Pablo from his "relationship with the mother is outweighed by the physical and emotional benefit that [he] would receive through permanency and stability of adoption" by the caregivers with whom Pablo has established a "strong[]" "bond." After denying the applicability of the exception, the court ordered mother's parental rights over Pablo terminated.

### E. *Appeal*

Mother filed this timely appeal.

## DISCUSSION

Mother argues that the trial court erred in denying her section 388 petition and in rejecting her argument that the parent-child bond exception applies in this case.

## I. Section 388 Petition

To establish entitlement of modification of a prior juvenile court order under section 388, the petitioning parent must show (1) "a change of circumstances," and (2) that the "modification of the prior order would be in the best interests of the minor child." (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223; *In re Mickel O.* (2011) 197 Cal.App.4th 586, 615 (*Mickel O.*).) In evaluating the petition, the juvenile court "may consider the entire factual procedural history of the case." (*Mickel O.*, at p. 616.)

The burden of making each showing rests with the parent (*In re Angel B.* (2002) 97 Cal.App.4th 454, 461 (*Angel B.*)), and

7

that burden is particularly heavy where, as here, reunification services were never available in the first place.  That is because, in this situation, the focus of the dependency proceedings is on addressing the child's need for a "'stable [and] permanent'" home rather than the parent's desire for reunification.  (*In re Jasmon O.* (1994) 8 Cal.4th 398, 419-420; cf. *In re William B.* (2008) 163 Cal.App.4th 1220, 1229 [focus is not reunification when such services are not being offered].)  Thus, courts insist that the circumstances be *changed*, not merely *changing* because "stability for the child" is not "promote[d]" by "delaying" "the selection of a permanent home for a child" "[just] to see if a parent, who has repeatedly failed to unify with the child, might be able to reunify at some future point."  (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47, disapproved on another ground by *In re Caden C.* (2021) 11 Cal.5th 614, 636 & fn. 5.)  And "stability and continuity" "assume[] an increasingly important role" in evaluating "the child's best interest."  (*Angel B.*, at p. 464; *In re Marilyn H.* (1993) 5 Cal.4th 295, 310 ["after termination of reunification services," "continued care [by his current caregiver] is [presumptively] in the best interest of the child"].)  We review the denial of a section 388 petition for an abuse of discretion.  (*In re Alayah J.* (2017) 9 Cal.App.5th 469, 478.)

The juvenile court did not abuse its discretion in denying mother's section 388 petition in this case.

The juvenile court did not abuse its discretion in concluding that mother's circumstances were merely changing, and not changed.  As reflected in the sustained allegations, the juvenile court's intervention in this case was designed to address three issues—namely, (1) mother's longstanding drug addiction, (2) mother's domestic violence, and (3) mother's mental and

8

emotional health issues. Although mother's section 388 petition indicated that she had taken meaningful steps toward addressing her drug addiction, which may indicate changed circumstances *as to that issue*, mother had yet to take any meaningful steps to address the domestic violence and mental health issues. Mother urges that she broke off her romantic relationship with father, so any concern with domestic violence is effectively addressed. But this ignores that mother has engaged in domestic violence with the fathers of Pablo's half-siblings and *inflicted* domestic violence against Pablo's father, yet mother has not taken any domestic violence courses to address how to cope with being a victim or an aggressor. Mother also urges that she signed up for classes to address her mental health issues. Again, this is admirable, but is just a first step that shows at best changing circumstances, not changed. Mother's entreaty that we give dispositive weight to maternal grandmother's opinion that mother has changed is little more than a request to reweigh the evidence, which we may not do. Mother lastly urges that reversal is compelled by several cases she cites. We disagree, as those cases either deal with what quantum of evidence is necessary to obtain an evidentiary hearing on a section 388 petition (which is irrelevant here because mother had such a hearing) (cf. *In re Aljamie D.* (2000) 84 Cal.App.4th 424, 432; *In re Daijah T.* (2000) 83 Cal.App.4th 666, 673-675), or are distinguishable on their facts (cf. *In re J.C.* (2014) 226 Cal.App.4th 503, 519, 526 [parent's long-term sobriety and completion of drug classes constitutes "changed circumstances" when those are the sole basis for dependency jurisdiction]; *In re J.M.* (2020) 50 Cal.App.5th 833, 836-837, 846, 849 [parent's "complet[ion of] all programs to address" "domestic

9

violence" constitutes "changed circumstances" when it is the sole basis for dependency jurisdiction].)

The juvenile court also did not abuse its discretion in concluding that granting mother's 388 petition was not in Pablo's best interests, which are now concerned with "stability and "continuity." In deciding whether to postpone resolution of this case and thus postpone the stability in Pablo's life, the court properly weighed the stability that comes from Pablo's demonstrated and longstanding bond with his current caregivers against the benefit that would accrue if mother had six months of reunification services. Given that mother had yet to address two of the three outstanding issues in the prior three years of juvenile court supervision and that her visitation with Pablo had been inconsistent during those years, the court did not abuse its discretion in finding that the balance tipped in favor of Pablo's stability. Mother urges that a child's bond with his current caregivers cannot be sufficient by itself to deny relief because that bond occurs in every case (*In re S.B.* (2008) 164 Cal.App.4th 289, 298-299 [the fact that a child's "primary attachment" is to the caregiver is not a basis for denying a section 388 petition]), but the juvenile court did not treat Pablo's bond with his caregivers as dispositive; the fact that the juvenile court properly considered it to be *relevant* did not invalidate its analysis. Mother also urges Pablo calls her "mother," but he also calls parental aunt "mother" and Pablo's generous use of terms of endearment does not mean that the juvenile court abused its discretion in determining that Pablo's best interests favored moving forward with the termination of parental rights rather than giving mother a further opportunity to alter her behavior.

10

## II.  Termination of Parental Rights

Once a juvenile court has terminated reunification services or a parent is deemed ineligible for them at the outset, the court "shall terminate parental rights" if it finds, "'by clear and convincing evidence,'" "'that it is likely the [child] will be adopted'" within a reasonable time.  (§ 366.26, subds. (a) & (c)(1); *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249-250.)  Thus, a juvenile court must terminate parental rights and order adoption unless the parent opposing termination proves that one of six statutory exceptions applies.  (§ 366.26, subds. (c)(1) & (c)(1)(B); *In re I.W.* (2009) 180 Cal.App.4th 1517, 1527, overruled in part on other grounds as stated in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010 & fn. 7).

One of the six exceptions is the beneficial parent-child relationship exception.  Because this exception "applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adopted home, would be harmful for the child," a court will find the exception applicable only if the parent "establish[es]" "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child."  (*In re Caden C.* (2021) 11 Cal.5th 614, 630, 631, 635 (*Caden C.*), italics in original.)  In assessing whether the parent has engaged in regular visitation and contact, a court looks to how the parent's actual visits measure up against the extent of visitation permitted by the juvenile court's orders (*id.* at pp. 632, 636); to satisfy this element, contact has to be consistent; "sporadic" visits, or visitation with "significant lapses," are not enough.  (*In re A.G.*

11

(2020) 58 Cal.App.5th 973, 994-995; *In re I.R.* (2014) 226 Cal.App.4th 201, 212.)  In assessing whether the child would benefit from a continued relationship with the parent, the parent must show "that the child has a substantial, positive, emotional attachment the parent" in light of several factors, such as the "'[(1)] the age of the child, [(2)] the portion of the child's life spent in the parent's custody, [(3)] the "positive" or "negative" effect of the interaction between parent and child, and [(4)] the child's particular needs.'"  (*Caden C.*, at pp. 632, 636, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)  Because this exception merely precludes the termination of parental rights but does not place the child back into the parent's custody, whether the parent would be able to care for the child on her own is not relevant.  (*In re D.M.* (2021) 71 Cal.App.5th 261, 270-271; *In re J.D.* (2021) 70 Cal.App.5th 833, 864-865; *In re B.D.* (2021) 66 Cal.App.5th 1218, 1229.)  In assessing whether the termination of parental rights would be detrimental to the child "when balanced against the countervailing benefit of a new, adoptive home," a court is to examine "how the child would be affected by losing the parental relationship" entirely.  (*Caden C.*, at pp. 633, 636-637.)  This is necessarily a "subtle, case-specific inquiry." (*Ibid.*)  We review a juvenile court's findings regarding the first two elements (visitation and relationship) for substantial evidence, and its ruling regarding the third element (balancing of detriment versus benefit) for an abuse of discretion.  (*Id.* at pp. 639-641.)

The juvenile court did not err in ruling that the parent-child bond exception did not justify relief from the default presumption in favor of terminating mother's parental rights.

12

Substantial evidence supports the juvenile court's finding that mother did not regularly visit Pablo.  Setting aside the first seven months of juvenile court oversight when mother was incarcerated or in a "no visitation" drug treatment program, mother's visits with Pablo over the ensuing 29 months were far less than the number of visits authorized by the juvenile court's orders, were sporadic, and had significant lapses.  Indeed, mother frankly admitted to the Department's social worker that her visits were *not* "consistent."  Mother's request that we weigh this evidence differently is beyond our purview under substantial evidence review.  (*People v. Prunty* (2015) 62 Cal.4th 59, 89 (conc. & dis. opn. of Cantil-Sakauye, C.J.).)

Substantial evidence also supports the juvenile court's finding that Pablo did not have a "substantial, positive, emotional attachment" to mother.  Pablo is now three years old, and only spent the first six months of his life with mother.  Although Pablo calls mother "mom" when they visit and the visits that they have are good ones, they are sporadic, and few and far between.  In the 29 months that mother was *able* to visit Pablo, she has visited him fewer than 20 times (out of more than 200 opportunities for visits).  The fact that mother loves Pablo, while critical, does not alone "suffice[] to establish the exception overall."  (*In re J.D., supra*, 70 Cal.App.5th at p. 857, fn. 17.)

Lastly, the juvenile court did not abuse its discretion in determining that the loss of Pablo's intermittent relationship with mother would not be detrimental to him vis-à-vis what he would gain from the benefit of his new, adoptive home with his caregivers.  Here, there is no evidence that Pablo suffered any detriment or was even unhappy when his visits with mother were

over.  (Cf. *In re E.T.* (2018) 31 Cal.App.5th 68, 76; *In re Amber M.* (2002) 103 Cal.App.4th 681, 689-690.)

## DISPOSITION

The orders are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.

HOFFSTADT

We concur:


_____, P. J.

LUI


_____, J.

ASHMANN-GERST

14